STATE OF WEST VIRGINIA
SUPREME COURT OF APPEALS

**FILED**
**May 20, 2021**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**Emil N.,**
**Respondent Below, Petitioner**

**vs.)  No. 20-0396** (Ohio County 20-CAP-3 MJO)

**Healy B.-N.,**
**Petitioner Below, Respondent**

## MEMORANDUM DECISION

Petitioner Emil N., by counsel Robert G. McCoid, appeals the Circuit Court of Ohio County's May 15, 2020, order denying his appeal and respondent's cross-petition for appeal from the family court's order addressing equitable distribution, petitioner's contempt, and petitioner's abuse of the discovery process.[1] Respondent Healy B.-N., by counsel Mike Kelly and H. Truman Chafin, filed a response, which includes cross-assignments of error. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

The parties married on May 8, 2010, separated on March 26, 2016, and were divorced by bifurcated order entered on February 19, 2019. No children were born of their marriage.

Before and during the majority of the parties' marriage, petitioner was employed as a chiropractor and owned a clinic (the "Clinic"). While employed as a chiropractor, petitioner became the subject of a federal investigation concerning alleged fraudulent medical billing and tax fraud. Petitioner was served with a federal grand jury subpoena in December of 2012. Soon after, he and respondent retained the legal services of Paul Harris.

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *In re Jeffrey R.L.*, 190 W. Va. 24, 435 S.E.2d 162 (1993); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

Petitioner, represented by Mr. Harris, filed suit on January 29, 2013, in Marshall County, West Virginia, against The Health Plan of the Upper Ohio Valley, Inc., ("The Health Plan") and a key accounts manager within that organization, alleging that, since September of 2011, The Health Plan improperly withheld reimbursements for services petitioner had rendered. Petitioner asserted claims for declaratory judgment, breach of contract, tortious interference with business relations, defamation, and violation of the Prompt Pay Act.[2] Petitioner's claimed damages included $453,879.30 in outstanding payment obligations for services he had rendered.

The Marshall County civil litigation proceeded to trial but settled two days in, on May 17, 2016. The confidential settlement reached in that litigation provided that The Health Plan would pay $2,000,000 to petitioner, $80,000 of which was to "constitute full and final payment for [petitioner's] alleged losses for billings." It further provided that the remaining $1,920,000 was "attributable to [petitioner's] alleged damages for his personal injury claim."

At a minimum, $80,000 of the settlement was subject to equitable distribution; accordingly, the family court directed petitioner to deposit $40,000 into his attorney's IOLTA account on October 24, 2017. The family court also directed petitioner to provide a full written accounting of 50% of the settlement proceeds. Later, in June of 2017, the family court ordered petitioner to deposit into escrow 50% of his settlement proceeds until the family court could determine the appropriate division of those proceeds. Petitioner failed to comply with these orders, so respondent filed a petition for contempt and for an award of fees and costs on November 28, 2018.

In response, petitioner asserted that the order directing him to escrow 50% of the settlement proceeds "was entered upon the mistaken representation that [respondent] had no funds." Petitioner further stated that "$600,000 representing approximately 50% of the [settlement] proceeds, is represented in a note secured by a first deed of trust on property located within Ohio County, West Virginia. The principal of the note has not been invaded. . . . [Petitioner] has therefore complied with the [c]ourt's Order." Petitioner provided this same argument in defense of his failure to provide a full accounting of the settlement proceeds. Although petitioner represented that he would deposit $40,000 into his counsel's IOLTA account within "thirty days of January 18, 2019," he failed to do so.

The family court held a final hearing over four days—April 2, 2019, April 3, 2019, April 10, 2019, and August 14, 2019—during which it heard evidence related to whether the settlement proceeds, or any particular amounts, were marital property; petitioner's continued failure to comply with court orders regarding those proceeds; and whether petitioner had abused the discovery process. The family court heard testimony from Mr. Harris and the parties.

Of relevance to petitioner's failure to escrow 50% of the settlement proceeds, the evidence revealed that petitioner had invested $600,000 of the settlement proceeds into an entity (99% of which was owned by petitioner), which had then loaned the money to another corporation. Petitioner received interest-only payments on that loan of $8,500 per month, and the principal amount of $600,000 was to be repaid in a balloon payment in July of 2019. By order entered on April 25, 2019, the family court found petitioner in indirect civil contempt and ordered that the

---

[2] *See* W. Va. Code §§ 33-45-1 through -8.

principal amount of $600,000 be frozen until further order of the court. The family court also directed that the principal amount be deposited with the Circuit Clerk of Ohio County upon repayment, and it imposed a constructive trust upon the $600,000 for respondent's benefit.

The family court entered a separate order on August 16, 2019, addressing the $40,000 payment it previously directed be deposited into petitioner's counsel's IOLTA account. In that order, the court detailed that petitioner had orally represented that he would make the required deposit, and he later represented that he had made the deposit. Petitioner's counsel, however, denied that any such deposit had been made. The court also documented petitioner's $8,500 monthly interest payments from his investment of the settlement proceeds, which proceeds, as the court further detailed, had been "ordered . . . to be placed in escrow but the [petitioner] ignored that order and invested the funds"; that petitioner had traveled to Europe twice in the preceding year; that he leased a luxury automobile for his personal transportation; and that, in sum, petitioner had the financial ability to obtain the required funds for deposit but had failed to do so. The court found petitioner in contempt and ordered that he be incarcerated for ten days; however, the court provided that petitioner could purge himself of the contempt by depositing $40,000 with the Circuit Court of Ohio County. Petitioner did purge himself of this contempt.

On January 22, 2020, the family court issued its "Final Order." Beginning with its findings relative to its allocation of the settlement proceeds, the family court noted that, based upon Mr. Harris's testimony, the Marshall County litigation against The Health Plan "was filed as collateral civil litigation ancillary to the federal investigation to have a vehicle for discovery and build a defense." As a result, the court found, much of the work performed by Mr. Harris and his law firm was applicable to his representation during both the federal investigation and the civil litigation, and Mr. Harris testified that he planned to seek reimbursement of the attorney's fees and investigative costs expended in both the federal investigation and civil litigation from The Health Plan under the fee-shifting provision of the Prompt Pay Act.[3] Between January of 2013 and November of 2015, the parties paid more than $700,000 in attorney's fees and more than $50,000 in investigative costs related to the federal investigation and civil litigation.

In addition to the attorney's fees and costs petitioner sought to recover from The Health Plan, discovery produced in that litigation showed that petitioner claimed damages totaling $22,000,000 for the loss of his business practice and $453,879.30 in unpaid billings, plus interest in the amount of $141,063.99 on those unpaid billings. Ultimately, petitioner intended to ask the jury for a verdict in the range of $80 to $100 million.

Concerning the unpaid billings, the family court recounted Mr. Harris's testimony that the $453,879.30 figure represented "gross" billings that did not account for the contractual discount, that a third-party audit undertaken to calculate that figure was inaccurate, and that he believed $80,000 was the most accurate calculation of unpaid medical billings. Petitioner, on the other hand, testified that the lawsuit was filed because The Health Plan owed the Clinic $300,000 for unpaid bills.

---

[3] *See* W. Va. Code § 33-45-3.

Bearing these facts in mind, the family court found that the designation of $1,920,000 in the settlement agreement as petitioner's "personal injury" damages did not "accurately reflect reimbursement for economic losses suffered by the Clinic and the expenditures of over $700,000.00 in marital funds for attorney['s] fees and investigative costs, recoupment of both of which would have been considered a marital asset subject to equitable distribution." The court noted that petitioner produced "no documentary evidence whatsoever" to support his claim that $80,000 in economic damages was more accurate than the over $450,000 claimed in his complaint, which was based on a third-party audit, or the $300,000 he claimed The Health Plan owed when he testified before the family court. Petitioner likewise failed to produce any evidence to support his assertion that his personal injury was of such magnitude to constitute 96% of the settlement proceeds. Since settling, petitioner attended and graduated law school, traveled extensively, and was preparing to take the bar exam. He did not testify to any mental or physical impairment that had hindered his enjoyment of life. The court also highlighted that petitioner and his attorney knew—prior to the execution of the settlement agreement Mr. Harris negotiated—that respondent had filed for divorce and was making a claim against a portion of the settlement proceeds.[4]

The family court further recognized that the federal investigation and actions taken by The Health Plan that led to the filing of the Marshall County litigation resulted in petitioner having to close his practice and that the bulk of claimed damages—$22,000,000—was related to the future lost value of the Clinic.

After weighing these considerations, the family court determined that it was reasonable to attribute $300,000 of the settlement proceeds to unpaid medical billings, $300,000 to reimbursement for attorney's fees expended during the federal investigation and The Health Plan litigation, $10,000 to petitioner's personal injury, and $1,390,000 to the loss of future value of the Clinic. Consequently, the court found that $600,000, or 30%, of the settlement proceeds constituted marital property subject to equitable distribution. Further finding that petitioner's net settlement proceeds totaled $1,333,200 after attorney's fees, the court determined that 30% of that sum, $399,960, was subject to equitable distribution. It found, therefore, that respondent was entitled to $199,980 from the settlement proceeds.

---

[4] Petitioner argued before the family court that footnote 9 of *Huber v. Huber*, 200 W. Va. 446, 490 S.E.2d 48 (1997), controlled the characterization of the settlement proceeds as either marital or nonmarital. In that footnote, this Court stated that "[r]egardless of the type of damages, economic or non-economic, if there is a tort settlement or verdict award expressly identifying the type of damages then proper evidence of the same is conclusive proof on the issue." *Id.* at 453 n.9, 490 S.E.2d at 55 n.9. The family court found that petitioner's "reliance on this dicta is misplaced" because "designations of tort settlements are often made for reasons unrelated to the underlying harm." The family court also found that "when a divorce is pending or anticipated, where designation is critical to equitable division, rote application of the agreement for designation of settlement proceeds creates an incentive to structuring settlements so as to diminish or preclude the legitimate claims of a spouse." This situation differed from one in which a jury, through special interrogatories, "assess[es] the propriety of the nature of the award" as an independent fact finder, the family court found, further noting that "no such safeguard exists with a negotiated settlement."

The family court then addressed petitioner's contempt and recounted the unheeded orders to escrow 50% of the settlement proceeds, provide a full written accounting of the proceeds, and deposit $40,000 into petitioner's attorney's IOLTA account. The court considered that respondent had to file several petitions for contempt to gain petitioner's compliance with these orders. The court also rejected petitioner's argument that "secur[ing] $600,000 in a note secured by a first deed of trust . . . constituted compliance with the [c]ourt's order for escrow," stating that it had not issued an order excusing petitioner from placing half of the settlement proceeds in escrow or an order allowing the proceeds to be secured by a first deed of trust on property.

Further, the family court found, petitioner failed to make the $40,000 deposit for nearly two years, and he had offered the dubious explanation that his failure was attributable to the fact that he was "barely squeezing by as it is" on the $8,500 monthly interest payments he was receiving from loaning the settlement proceeds he was ordered to escrow.[5] The family court recounted petitioner's representation to the court that he had deposited $40,000 into his attorney's IOLTA account, his counsel's denial of that, and petitioner's later admission that he had not made the deposit. In light of petitioner's "consistent non-compliance and misrepresentations," the family court determined that petitioner "has been and remains in indirect civil contempt" of the court's prior orders, though he had purged himself of the contempt related to the $40,000 deposit. Due to petitioner's noncompliance with the family court's orders, which necessitated respondent's filing of contempt petitions to secure orders preserving known marital assets, the court found that an award of $4,200 for attorney's fees was appropriate for petitioner's contempt.

The family court also addressed petitioner's abuse of the discovery process, beginning with the court's direction to file a financial statement by February 17, 2017, and provide supplemental financial statements that included the settlement information. Petitioner failed to file the required financial statement until September 11, 2017. Petitioner also failed to produce certain documentation he had been ordered to produce. The family court found

> that it is simply not credible that [petitioner] and [his attorney] do not have such basic documents as a settlement statement from the Health Plan case, nor a disbursement statement detailing the division of the proceeds between [petitioner and his attorney's law firm], nor a note evidencing the $600,000.00 loan . . ., nor a writing establishing that [petitioner's] true economic losses due to the Health Plan misconduct were only $80,000.00, nor the multitude of other documents ordered to be produced.

The family court further detailed that, on the last day of the hearing, August 14, 2019, after both sides had rested, petitioner's counsel sought to introduce into evidence various documents that had not previously been disclosed, which "belie[d] the assertion that the documents either could not be found or did not exist." The court observed that the majority of the requested but unproduced documents would have been created after petitioner and his attorney received notice that respondent had filed for divorce and intended to claim that the settlement proceeds were marital property. "Any reasonable litigant or their attorney would have preserved copies of such important

---

[5] During this same time, petitioner was paying $3,000 per month to rent an apartment in Charleston, South Carolina, and $1,500 per month to lease a Mercedes while attending law school.

documents so obviously relevant to this pending litigation." Having failed to do so, and finding that petitioner's failure to comply with discovery orders prevented respondent from "proceeding in this divorce action without unnecessary legal machinations to ferret out what [petitioner] was required to disclose," the court found that a sanction was warranted and awarded respondent $50,000 in attorney's fees.

Petitioner filed an appeal from the family court's January 22, 2020, final order with the circuit court on February 21, 2020. Petitioner alleged that the family court "erred in awarding in equitable distribution ($199,980.00) and attorney['s] fees ($54,200) plus interest in a marriage that lasted less than six years and both parties are able to earn income." He further alleged error in the equitable distribution of the settlement proceeds "when all but $80,000.00 of the proceeds are non-marital personal injury proceeds," in the family court's finding that he abused the discovery process without also addressing respondent's alleged wrongdoing, and in the family court's reduction of "attorney fees earned in the personal injury litigation and attributing that reduction to [petitioner] as marital."

Respondent filed a response and cross-petition for appeal before the circuit court. In her cross-petition for appeal, she challenged the family court's allocation of $1,390,000 to the loss of future value of the Clinic given "the complete absence of any evidence to support that amount." Respondent also claimed that, in addressing petitioner's contempt in failing to escrow $600,000, the family court failed to consider the $306,000 windfall he received in interest payments stemming from his disregard of the family court's order.

On May 15, 2020, the circuit court denied petitioner's appeal and respondent's cross-petition for appeal. It found that petitioner's claimed errors lacked a basis in the law and expressed an unwillingness "to get into the business of substituting its discretion for [the family court's] discretion unless egregious circumstance[s] require." With regard to respondent's assertion that the family court improperly allocated $1,390,000 to the loss of future value of the Clinic, the circuit court stated that respondent failed "to present legal authority supporting her implication that [the family court] is not permitted to make [its] own judgment regarding the distribution of the settlement proceeds." The circuit court also took note of the "exhaustive detail within the [f]amily [c]ourt [o]rder supporting the rationale" of its distribution.[6] Addressing respondent's claim that the sanction imposed for petitioner's willful disregard of court orders was insufficient, the circuit court underscored the broad discretion afforded courts when fashioning such sanctions; the circuit court, therefore, declined to disturb the sanction imposed by the family court. It is from this order that the parties appeal.

On appeal, petitioner raises three assignments of error and respondent raises two cross-assignments of error. Our review of these claims is governed by the standard set forth in Syllabus Point 1 of *Zickefoose v. Zickefoose*, 228 W. Va. 708, 724 S.E.2d 312 (2012):

> "In reviewing a final order entered by a circuit judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the

---

[6] The family court's order was fifty-four pages.

findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*." Syl., *Carr v. Hancock*, 216 W.Va. 474, 607 S.E.2d 803 (2004).

Petitioner first argues that the lower courts erred in characterizing anything above $80,000 from the settlement proceeds as marital property. Petitioner claims that The Health Plan's actions caused him "great pain and anguish and there was testimony at the trial of the matter that The Health Plan intentionally and maliciously sought to destroy" him, but he does not cite to any portion of the record to support this claim. Petitioner also highlights that respondent chose not to participate in the Marshall County litigation, seeking to intervene only after a settlement had been reached. Petitioner contends that because respondent did not appeal from the order denying her motion to intervene, she has waived any claim to the funds beyond the $80,000. Petitioner also argues that the family court, in awarding a sum greater than $40,000 to respondent, made findings contrary to the plain language of the settlement agreement.[7] Petitioner further claims that The Health Plan would not have agreed to designate $80,000 as lost billings "because that portion is presumably able to be deducted on The Health Plan's taxes," but he fails to support this "presumption" with citation to any authority.[8]

In *Hardy v. Hardy*, 186 W. Va. 496, 413 S.E.2d 151 (1991), this Court adopted the analytical approach for use in determining whether personal injury awards are subject to equitable distribution. This approach "draws a distinction between the economic loss suffered by the marital partnership and the economic and personal loss suffered by each individual spouse and asks what a personal injury award was intended to replace." *Id.* at 499, 413 S.E.2d at 154. "To the extent that its purpose is to compensate an individual for pain, suffering, disability, disfigurement, or other debilitation of the mind or body, a personal injury award constitutes the separate nonmarital

---

[7] Petitioner does not cite to footnote 9 of *Huber* before this Court, and he has seemingly abandoned reliance on that footnote in favor of arguing that Syllabus Points 1 and 2 of *Hardy v. Hardy*, 186 W. Va. 496, 413 S.E.2d 151 (1991), quoted below, govern the resolution of this issue. Nevertheless, we note that the circumstances present here—one spouse's entry into a settlement agreement following notice that the other spouse had filed for divorce and intended to make a claim against the settlement proceeds—were not present or addressed in *Huber*; therefore, the dictum in footnote 9 of *Huber* does not control, a point with which petitioner seemingly agrees given that he no longer urges its application.

[8] Petitioner claimed below that the Health Plan would not have agreed to designate only $80,000 as economic losses without compelling evidence in support of that figure due to The Health Plan's claimed inability to deduct on its taxes funds paid as compensation for a personal injury. Citing 26 U.S.C. § 162(f), the family court disagreed, stating that a distinction between compensation for an alleged personal injury and compensation for lost business income does not affect The Health Plan's ability to deduct such payments as business expenses on its taxes. Aside from petitioner's "presumption" that such is not the case, he does not offer a meaningful challenge to the family court's finding; accordingly, we decline to address this claim. *See State v. Allen*, 208 W. Va. 144, 162, 539 S.E.2d 87, 105 (1999) (declining to review an assignment of error that lacked supporting authority).

property of an injured spouse." *Id.* at 497, 413 S.E.2d at 152, Syl. Pt. 1. On the other hand, "[e]conomic losses, such as past wages and medical expenses, which diminish the marital estate are distributable as marital property when recovered in a personal injury award or settlement." *Id.* at 497, 413 S.E.2d at 152, Syl. Pt. 2. "The burden of proving the purpose of part or all of a personal injury recovery is on the party seeking a nonmarital classification," *id.*, Syl. Pt. 3, and it must be proven by a preponderance of the evidence. *Huber*, 200 W. Va. at 451-52, 490 S.E.2d at 53-54. Finally, "[t]o the extent that the parties do not provide sufficient evidence to make an allocation of all of the tort settlement or verdict award under their respective burdens, such balance shall be classified as marital property and divided accordingly." *Id.* at 452, 490 S.E.2d at 54.

Petitioner simply did not present sufficient evidence to support his claim that $1,920,000 was to compensate him for his individual pain and suffering. As the family court noted, petitioner "produced no psychological or psychiatric report or evidence that his personal injury was of such magnitude as to rightfully consume 96% of the settlement amount." In fact, other than his testimony that he suffered from post-traumatic stress disorder, the family court noted that he "produced no evidence on his personal injury." The family court also found that he "presented no testimony of any mental or physical impairment that has hindered his enjoyment of life," particularly in light of the fact that, since settling, petitioner obtained his law degree, traveled extensively, and was preparing to take the bar exam.

Additionally, so long as the settlement proceeds were properly characterized as marital, respondent's nonparticipation in the lawsuit does not strip her of her right to receive her portion of that marital property. The Circuit Court of Marshall County denied respondent's motion to intervene because it was untimely; that court made no express findings as to her marital interest in the settlement proceeds. Moreover, in *Miller v. Miller*, 216 W. Va. 720, 613 S.E.2d 87 (2005), one party's receipt of settlement proceeds following the parties' separation, from a lawsuit only that party participated in, did not deprive the other party of her marital interest in those proceeds "because such recovery would not have been possible had it not been for the marital property litigation interest he earlier had acquired." *Id.* at 726, 613 S.E.2d at 93. Accordingly, we find no error in the lower courts' finding that petitioner failed to demonstrate that $1,920,000 should be deemed nonmarital.

Next, petitioner argues that the family court erred in finding that he abused the discovery process, particularly because the family court failed to take respondent's alleged wrongdoing into consideration. Petitioner asserts that the family court imposed discovery sanctions against him for failing to provide certain information, but it refused to require respondent to produce information he requested for "a complete and accurate report" of respondent's finances. Petitioner also claims that respondent "intercepted [his] attorney-client communications" by viewing a text message that appeared on a device left in plain sight. Thus, although petitioner disputes that sanctions were warranted against him, he argues that, if they were, sanctions should have also been levied against respondent, and he "prays that the sanctions against him be reversed."

While petitioner disagrees that sanctions should have been levied against him, he makes no argument in support of that position. Rather, his argument centers on the family court's failure to impose a sanction for respondent's alleged misconduct. Petitioner's recriminations against respondent do not supply justification for disturbing the family court's imposition of sanctions

8

against him. Indeed, he does not challenge a single finding undergirding the family court's sanction; accordingly, he has failed to demonstrate error in the family court's sanction predicated on his discovery abuses.

We further note that petitioner has not demonstrated any wrongdoing on respondent's part.[9] He cites no law to support his claim that he was entitled to the financial information that was purportedly withheld, which respondent contends concerned post-separation income. He also fails to substantiate his claim of misconduct in respondent's viewing of the communication from the attorney, which she says was received at a time when she was also represented by the attorney. In fact, petitioner cites no law in support of this assignment of error, a defect that in and of itself renders the assignment of error baseless. *See* W. Va. R. App. P. 10(c)(7) (requiring a brief to "contain an argument exhibiting clearly the points of fact and law presented, the standard of review applicable, and citing the authorities relied on, under headings that correspond with the assignments of error"); *Allen*, 208 W. Va. at 162, 539 S.E.2d at 105 (declining to review an assignment of error that lacked supporting authority).

In petitioner's final assignment of error, he argues that the family court erred in directing that attorney's fees expended during the federal investigation involving the parties be reimbursed from his separate litigation proceeds. The attorney's fees at issue were paid between January of 2013 and March of 2015, prior to the parties' separation and for the benefit of both parties. Therefore, petitioner argues, "there can be no reimbursement by [petitioner's] separate and non-marital settlement proceeds."

This assignment of error is predicated on the same mistaken claim that underlies his first assignment of error, i.e., that all but $80,000 of the settlement proceeds are his separate, nonmarital property. Because petitioner did not establish that the remaining settlement proceeds were his separate, nonmarital property in the first instance, his contrary assertion alone is insufficient to establish error in the family court's allocation of a portion of those settlement proceeds to the recoupment of the parties' attorney's fees and costs. We further observe that, in determining the proper allocation of the settlement proceeds, the family court received evidence quantifying the attorney's fees and costs outlaid by the parties in the federal and state legal matters. Those expenses were unquestionably paid from marital funds. Additionally, the family court heard evidence on the interrelatedness of the two matters and Mr. Harris's intention to seek reimbursement of all expenditures in The Health Plan litigation. Petitioner has, therefore, failed to demonstrate error in the family court's allocation of settlement funds toward recoupment of those marital funds.[10]

In respondent's first cross-assignment of error, she also takes issue with the family court's equitable distribution. She argues that the family court erred in not fully reimbursing the parties' attorney's fees and investigative costs from the settlement proceeds and in attributing the majority of the settlement proceeds to the loss of future value of the Clinic. Respondent argues that no one

---

[9] In addition, petitioner does not direct this Court to his filing of a petition for contempt below, and this Court's review of the record does not reveal any such filing.

[10] Again, petitioner fails to cite any authority to support this claimed error. For this additional reason, he has not demonstrated error in the lower courts' determinations.

asked for an allocation for the loss of future value of the Clinic, and she likens the family court's unrequested allocation to a court's dismissal of a claim where no party moved for dismissal, which we found to be in clear error in *State ex rel. National Fire Insurance Co. of Pittsburgh, Pa. v. Hummel*, 243 W. Va. 681, 850 S.E.2d 680 (2020). Respondent further claims that the loss of future value allocation was made without supporting evidence, and she argues that such value needed to have been based on a sound valuation method under *May v. May*, 214 W. Va. 394, 589 S.E.2d 536 (2003).

Respondent's reliance on *National Fire Insurance Co.* is misplaced. The family court's allocation was not done sua sponte, as was the case in *National Fire Insurance Co. See* 243 W. Va. at __, 850 S.E.2d at 682. To the contrary, the family court took evidence over the course of four days on The Health Plan litigation, the attorney's fees and investigative costs expended in that litigation and the related federal investigation, the damages sought in The Health Plan litigation, and the support for the damages sought in The Health Plan litigation. During these proceedings, respondent's counsel even questioned petitioner about whether he attributed the Clinic's closure to the litigation. The family court took evidence for the express purpose of determining which portions of the settlement proceeds could be classified as marital. Therefore, respondent cannot claim to be caught off guard by the family court's action.

Respondent's reliance on *May* is similarly misplaced. *May* involved valuing a husband's solo dental practice—and, in particular, whether a value for goodwill could be assigned to that dental practice—for the purpose of equitable distribution. 214 W. Va. at 398-99, 589 S.E.2d at 540-41. *May* did not involve the allocation of settlement proceeds, and the family court here was not undertaking a valuation of the Clinic per se. Rather, as stated above, the parties were before the family court for the purpose of determining which portions of the settlement proceeds could be classified as martial property. Petitioner submitted discovery responses produced in The Health Plan litigation claiming that the "value of the practice is $22,000,000.00 (twenty-two million dollars) which is for 22 years at $1,000,000.00 (one million) per year for twenty-two years," which the family court noted constituted the "lion's share of the damages sought." The family court also considered that the Clinic was in operation for ten years prior to the parties' marriage and that it was no longer in operation. The family court attributed that closure to The Health Plan litigation and federal investigation.[11] In view of the evidence presented, these findings are not clearly erroneous; therefore, they will be upheld. *Zickefoose*, 228 W. Va. at 709, 724 S.E.2d at 313, Syl. Pt. 1. We further find no abuse of the family court's discretion in its application of the law to these facts. *See id.*

Respondent's final cross-assignment of error relates to petitioner's contempt and the alleged windfall he obtained as a result. Respondent argues that petitioner flouted the family court's order directing him to escrow 50% of the settlement proceeds, which allowed him to lend the proceeds and receive monthly interest payments on that loan totaling $306,000. Respondent contends that petitioner should have been held "accountable for his dissipation of marital assets,"

---

[11] Although respondent claims that when questioned about the cause of the closure, petitioner blamed respondent, rather than the litigation, our review of the proceedings shows that petitioner, in fact, also attributed the closure to the litigation.

and "under no circumstances should [petitioner have been] rewarded for his defiance of the family court's orders." *Deitz v. Deitz*, 222 W. Va. 46, 60, 659 S.E.2d 331, 345 (2008).

Respondent relies on *Deitz* to argue that the family court should have imposed a harsher sanction against petitioner; however, in *Deitz*, we stated that "we typically have afforded broad discretion to lower courts imposing sanctions for contempt to enable those tribunals to fashion a punishment that corresponds with the intransigence of the contemnor" and that a court may "impos[e] whatever legal sanctions it ch[ooses] to compel the [contemnor's] acquiescence to the court's authority." *Id.* at 59, 659 S.E.2d at 344 (citation omitted). In exercising its broad discretion, the family court considered petitioner's intransigence and set out to "devise a sanction that will ensure [petitioner's] timely payment of the money to which [respondent] is entitled by holding [petitioner] accountable for his transmutation for his sole benefit of marital assets and to ensure that [respondent] receives her equitable share of the marital property." In its reasoned judgment, the family court determined that an award of attorney's fees was appropriate, which was "designed [by the court] to compensate [respondent] for losses sustained (including an award of attorney['s] fees), to coerce obedience for her benefit and to prevent him from reaping benefits from his defiance of the [c]ourt's Orders." We find no abuse of the family court's discretion in fashioning this sanction or the circuit court's affirmation of the family court's order.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** May 20, 2021

**CONCURRED IN BY:**

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton

11